UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
In re:                                                    Chapter 11

HRH CONSTRUCTION LLC, *et al.*,                           Case No. 09-23665 (RDD)

                                Debtors.                  Jointly Administered
----------------------------------------------------------------X
NYU HOSPITALS CENTER,

                        Plaintiff,

                v.

HRH CONSTRUCTION LLC,

                        Defendant.
                                                          Adv. Pro. No. 10-8242 (SHL)
CURTIS PARTITION CORPORATION,

                        Plaintiff,

                v.

HRH CONSTRUCTION LLC,
NYU HOSPITALS CENTER, *et al.*,

                        Defendants.
----------------------------------------------------------------X

## MEMORANDUM DECISION AND ORDER

A P P E A R A N C E S:

HOLLAND & KNIGHT LLP
Attorneys for NYU Hospitals Center
31 West 52nd Street
New York, New York 10019
        Frederick R. Rohn, Esq.
        Henry A. H. Rosenzweig, Esq.

HERRICK, FEINSTEIN LLP
Attorneys for HRH Construction LLC
2 Park Avenue
New York, New York 10016
        William R. Fried, Esq.
        Kerry K. Jardine, Esq.

KIRSCH GARTENBERG HOWARD LLP
Attorneys for Curtis Partition Corporation
11 Penn Plaza, Fifth Floor
New York, New York 10001
     Jesse C. Klaproth, Esq.

**SEAN H. LANE**
**United States Bankruptcy Judge:**

     This action arises out of a construction contract dispute among debtor HRH Construction LLC ("HRH"), facilities owner NYU Hospitals Center ("NYU"), and sub-contractor Curtis Partition Corporation ("Curtis").[1]  NYU claims that HRH breached their contract by failing to proceed with phase 2 of a multi-phased construction project.  HRH counters that it was neither required nor able to move forward with phase 2 because NYU failed to meet with HRH, as contractually mandated, to negotiate and resolve outstanding issues, including a plan for the remaining work.  HRH also claims that NYU breached the contract by failing to make required payments on approved requisitions.  A trial was held on January 5, 6, 7, and 10 before this Court. For the reasons set forth more fully below, the Court finds in favor of debtor HRH and awards damages for three unpaid requisitions.

## BACKGROUND

**A.    Findings of Fact**

     Pursuant to an agreement dated October 21, 2003, HRH was hired to renovate NYU's existing radiology center in Manhattan (the "Construction Agreement").  Trial Ex. 1.  Because NYU wanted the radiology department to remain operational during the renovation, the construction project was to be accomplished in a sequence of phases, with the first phase

---

[1]  Additional parties are mentioned in the pleadings, but only HRH, NYU, and Curtis have appeared before the Court.

designated as phase 0.  Berger Aff. ¶ 8 (Dec. 13, 2010);[2] Trial Tr. 13:17-21 (Jan. 5, 2011).  HRH

agreed to complete the work for a guaranteed maximum price of $8,520,000, subject to equitable

adjustment by submission of proposed change orders by the contractor for unforeseen conditions

arising during the work.  Trial Ex. 1, Construction Agreement § 3.6.  Over the course of the

project, NYU approved change orders in the aggregate amount of $907,447, thereby increasing

the guaranteed maximum price to $9,427,447.  Trial Exs. 9-13; Berger Aff. ¶ 54; Ross Aff. ¶ 8

(Dec. 13, 2010).  As contemplated by the Construction Agreement, HRH entered into several

subcontracts, including one with Curtis for work on drywall, carpentry, and acoustical ceilings.[3]

Trial Ex. 1, Construction Agreement § 3.3; Trial Ex. 4; Berger Aff. ¶ 7.

For periodic reimbursement of its costs and expenses, HRH was required to submit

requisitions to NYU on a monthly basis.  Trial Ex. 1, Construction Agreement § 10.1.1.  Each

requisition was subject to written approval by NYU before NYU would pay HRH on the

requisition.  See Trial Ex. 1, Construction Agreement § 10.1.7.  NYU was permitted to withhold

approval of any requisitions that reflected disputed work.  Id.  Importantly, NYU was required to

approve or disapprove requisitions within twelve business days of receipt.  Id.; Trial Tr. 122:25-

123:3 (Jan. 5, 2011).  If NYU disapproved a requisition or a portion thereof, NYU was required

to "prepare and promptly issue" to HRH a written statement describing those items in the

requisition that were not approved.  Trial Ex. 1, Construction Agreement § 10.1.7.  Within thirty

days of approving a requisition, NYU was to pay the requisition regardless of whether HRH

continued working in the future.  Id. at § 10.2; Trial Tr. 122:20-24 (Jan. 5, 2011).  See also Trial

Ex. 1, Construction Agreement § 13.1; Trial Ex. 3, Completion Agreement ¶ 2(d).  Within ninety

---

[2]  Direct testimony by all parties for the trial was presented by affidavit.

[3]  The subcontract was dated November 12, 2003 and was signed by Curtis on January 28, 2004.  Trial Ex. 4.

days of approval, HRH was to pay any relevant subcontractors like Curtis.[4]  Trial Ex. 4,

Subcontract § 10.1(a).  According to article 13.1 of the Construction Agreement, "[HRH] shall

have no right to suspend all or any part of the Work or to refuse to comply with any written

instruction, direction or order of [NYU] pending resolution of any dispute or for any other

reason, provided that [NYU] continues to make payments of undisputed amounts as provided in

this Agreement."  Trial Ex. 1, Construction Agreement § 13.1 (emphasis added).

    The construction project encountered delays in 2004 and early 2005.  See Berger Aff.

¶ 21; DeCesare Aff. ¶ 19 (Dec. 10, 2010).  HRH contends that these delays were due to

unanticipated difficulties.  For example, while the contract contemplated raising the ceilings in

the facility, the ceilings were lowered during construction to increase the area needed for new

installations.  Fox Aff. ¶ 15 (Dec. 13, 2010).  In addition, it is undisputed that NYU failed to

make timely payments, which led unpaid subcontractors to neglect their duties.  Trial Tr. 111:22-

112:5 (Jan. 5, 2011); Fox Aff. ¶¶ 21-23; Trial Exs. 216, 217, 220.  See also Trial Ex. 221, units

73.1, 73.3; Egeberg Dep. 158:24-159:25 (May 14, 2007).[5]  NYU counters that the project delays

were a result of HRH's inadequate management and supervision of the work.  Berger Aff. ¶¶ 23-

31; DeCesare Aff. ¶¶ 22-31.

    HRH and NYU attempted to resolve their differences by entering into a Completion

Agreement dated May 11, 2005.[6]  Trial Ex. 3; Berger Aff. ¶ 32; Ross Aff. ¶ 28.  NYU's

---

[4]  The subcontract is vague about when the 90 day periods begin, using the verb "furnished" somewhat
ambiguously: "[HRH] shall pay . . . on or about the 90th day after such requisition was furnished, a sum equal to
the amount shown in such requisition . . . ."  Trial Ex. 4, Subcontract § 10.1(a).

[5]  Mr. Egeberg did not appear at trial, but the parties stipulated to use of his deposition in lieu of live testimony.

[6]  On December 22, 2010, HRH filed a motion in limine to preclude evidence relating to the period prior to the
execution of the Completion Agreement.  This motion was denied at trial.  See Order Granting and Denying
Certain Pre-Trial Motions filed on January 10, 2011 at docket entry 26.  HRH renewed its motion in its post-trial
briefing.  As events prior to the Completion Agreement provide the background necessary to understand the
present dispute between the parties, the Court once again denies the motion.

4

attorneys drafted the Completion Agreement at the request of NYU's facilities manager, Mr.

Kenneth Egeberg. Egeberg Dep. 163:22-164:2. See also Trial Tr. 123:8-10 (Jan. 5, 2011). Mr.

Egeberg understood that the Completion Agreement was intended, at least in part, to give HRH's

subcontractors more confidence that NYU would make timely payments going forward.

Egeberg Dep. 162:15-163:17. According to Mr. Egeberg, the subcontractors were reducing

manpower and/or refusing to work because of NYU's failure to make timely payments as early

as May 4, 2005. Id. at 159:16-21. "It was not a new development," Mr. Egeberg explained. Id.

at 159:21. Mr. Egeberg testified regarding the purpose of the Completion Agreement:

> It was my opinion that the performance of HRH over a sustained
> period of time was miserable. Equally as miserable was [NYU's]
> lousy pattern of payment. . . . if we wanted to do anything, to give
> us any opportunity to get the work done, that we would have to do
> something to improve the payments dramatically to HRH and that
> would give us the ability to either keep HRH or consider what the
> next step should be in dealing with the HRH problem.

Id. at 161:7-162:4.

Under the terms of the Completion Agreement, NYU promised to make payments, on

dates certain, of four outstanding requisitions, and HRH promised to achieve "Substantial

Completion" of phases 0 and 1 of the construction project by June 15, 2005, which was

approximately fifteen months later than originally provided for in the Construction Agreement.

Trial Ex. 3, Completion Agreement ¶ 1; Berger Aff. ¶ 20; Trial Ex. 1, Construction Agreement,

Ex. C. Substantial Completion is a term defined by the underlying Construction Agreement to

reflect NYU's ability to use and occupy an area for its intended purposes. Trial Ex. 1,

Construction Agreement § 5.2; Trial Ex. 3, Completion Agreement ¶ 4. The Completion

Agreement clarified that Substantial Completion would include "all [w]ork necessary to obtain

New York State Department of Health ('DOH') approval for full use and occupancy of the Phase

0 and Phase 1 areas . . . ." Trial Ex. 3, Completion Agreement ¶ 1.

NYU issued payments to HRH for the four requisitions listed in the Completion

Agreement. Trial Exs. 222, 225, 228. While HRH did not achieve Substantial Completion by

June 15, 2005, both NYU and HRH agree that Substantial Completion of phases 0 and 1 was

reached before the premises were inspected and approved by the Department of Health on June

21, 2005. Trial Tr. 125:9-10 (Jan. 5, 2011); DeCesare Aff. ¶ 36; Trial Exs. 226, 227. While the

June 15, 2005 Substantial Completion date was originally scheduled so as to permit an

inspection by the Department of Health, the date for such an inspection ultimately proved to be

June 21, 2005, a date scheduled at least thirty days prior. See Trial Tr. 91:4-92:3 (Jan. 5, 2011).

There is evidence that NYU used some of its own employees to prepare the premises for the

inspection. Trial Tr. 125:11-15, 168:18-23 (Jan. 5, 2011); DeCesare Aff. ¶ 35.

Pursuant to the Completion Agreement, following Substantial Completion of phases 0

and 1, NYU and HRH were to "meet (prior to the start of the next phase of the Work) to

negotiate and resolve remaining issues between them, including the schedule for completion of

the remaining Work." Trial Ex. 3, Completion Agreement ¶ 3. The parties seem to agree that,

after Substantial Completion of phases 0 and 1 was reached in June of 2005, little construction

work followed. NYU argues that HRH's failure to proceed with the next phase of work—phase

2—constituted the breach of contract that is central to its case. HRH counters by highlighting

the language in the Completion Agreement requiring that HRH and NYU first meet to negotiate

and resolve remaining issues between them before HRH was to proceed with the work. HRH

argues that, despite HRH's good faith efforts to schedule such a meeting, NYU refused to meet,

preventing HRH from continuing its work.

On this disagreement, Mr. Egeberg's testimony is particularly useful.  He understood that the Completion Agreement required a meeting after Substantial Completion of phases 0 and 1 before HRH could continue with phase 2.  He testified: "My view of what was in that payment agreement was that the parties needed to sit down and figure this out.  There was no time frame other than as soon as possible for both of us to figure out what we were going to do to continue." Egeberg Dep. 227:10-14 (May 15, 2007).

The parties' respective positions are reflected in their correspondence during the summer of 2005.  On July 11, 2005, HRH wrote to NYU explaining that HRH "would like to proceed with Phase 2."  Trial Exs. 132, 236.  The July 11, 2005 letter also identified certain issues that "need[ed] to be addressed" "in order to proceed" including a request that NYU "turn over all of the rooms designated under phase 2."  Id.  NYU did not respond to this letter.  Trial Tr. 172:13-173:13 (Jan. 5, 2011).  In fact, the meeting identified in the Completion Agreement as a prerequisite to proceeding with phase 2 never occurred.[7]  In any case, it is difficult to imagine that HRH was capable of commencing with phase 2 through July of 2005 because, by July 27, 2005, it is undisputed that the plan for phase 2 had not been finalized by NYU.[8]  Trial Ex. 237, item 80.4.

Around this time, Mr. Egeberg "suggested" to HRH that it needed to "submit something . . . to the hospital which identifies what the issues are."  Egeberg Dep. 212:3-16.  See also Egeberg Dep. 240:15-241:11.  Subsequently, HRH submitted a proposed change order dated

---

[7]  Mr. Egeberg was not aware of any such meeting occurring.  Egeberg Dep. 228:10- 229:7, 269:17-270:3.  Nor were other senior managers at NYU aware of any such meeting.  Trial Tr. 147:12-15, 163:2-165:23, 172:3-173:3 (Jan. 5, 2011).  At trial, NYU's counsel conceded, "I don't think they held a meeting in a formal sense.  There were conversations, instead."  Trial Tr. 26:8-11 (Jan. 5, 2011).

[8]  While NYU's senior project manager, John DeCesare, testified at one point that this plan was not necessary to start phase 2, Trial Tr. 187:7-9 (Jan. 5, 2011), Mr. DeCesare conceded on cross-examination that it would be "pretty tough" to start phase 2 without it.  Trial Tr. 180:2-13 (Jan. 5, 2011).

August 2, 2005 requesting that the guaranteed maximum price for the project be increased by approximately $4.1 million. Trial Ex. 238. This proposed change order included cost adjustments as requested by three subcontractors, plus cost adjustments exclusive to HRH, to fund the remainder of the project. Id. "We look forward to meeting with you to review this request," HRH wrote. Id.

NYU refused HRH's offer to meet.[9] Instead, NYU responded by letter dated August 5, 2005, stating that HRH's submissions did not "provide a basis for discussion or negotiations." Trial Ex. 34. NYU's letter also "hereby directed [HRH] to proceed with the Work immediately." Id. In a letter dated August 9, 2005, NYU reiterated its view that HRH's claim submissions from HRH's subcontractors "do not provide a basis for further discussion and are rejected." Trial Ex. 35. Similar language was employed by NYU in a letter to HRH dated August 23, 2005: "Your request does not provide a basis for negotiation and is denied . . . ." Trial Ex. 38.

On August 3, 2005, one day after HRH submitted its change order request of around $4.1 million, NYU wrote to another general contractor, Bovis Lend Lease LMB, Inc. ("Bovis"), in an apparent attempt to have Bovis replace HRH. Trial Ex. 134. Mr. Egeberg of NYU admitted that he gave Bovis permission to contact HRH's subcontractors on this project while the various subcontracts with HRH remained pending. Egeberg Dep. 278:10-17. The evidence strongly suggests that communications between Bovis and the subcontractors had a negative impact on HRH's ability to proceed with the project. See Trial Ex. 244, units 82.2, 83.3, 84.4, 85.3, 87.2, 88.2 (revealing that six separate subcontractors were delaying or refusing to return because of contact by a new general contractor). See also Ross Aff. ¶¶ 54-57; Behrouzian Aff. ¶¶ 14, 15, 18, 19 (Dec. 23, 2010); Egeberg Dep. 299:20-300:9. The construction meeting minutes of

---

[9] See supra note 6 and accompanying text.

August 24, 2005 further confirm that the parties were aware that the involvement of Bovis as a

potential replacement contractor was interfering with HRH's ability to work with its own

subcontractors.[10]  See Trial Ex. 244, units 82.2, 83.3, 84.4, 85.3, 87.2, 88.2.  See also Trial Tr.

182:2-183:21 (Jan. 5, 2011).

       In a letter dated August 17, 2005, NYU notified HRH that its "continuing lack of

progress constitutes a default" under the Construction Agreement.  Trial Ex. 36.  On August 22,

2005, HRH reminded NYU that NYU was in default of the payment terms of the Construction

Agreement.  Trial Ex. 37.  On October 27, 2005, NYU sent a letter terminating the Construction

Agreement.  Trial Ex. 39.  Bovis ultimately took over the project from HRH and hired many of

the subcontractors who had been working for HRH.  Trial Tr. 27:12-28:1 (Jan. 5, 2011); Trial

Exs. 49-53.

       HRH remains unpaid for requisitions 14, 15, 16, and 17 submitted for work on the project

through July of 2005.  Trial Tr. 114:10-14, 115:25-117:25 (Jan. 5, 2011).  These are the only

requisitions being claimed by HRH in this litigation.  See Trial Tr. 34:2-5 (Jan. 7, 2011).  NYU

approved requisition 14 by May 19, 2005 in the amount of $684,889, making this amount due by

June 18, 2005.  Trial Ex. 252; Trial Tr. 115:3-116:2 (Jan. 5, 2011).  See also Trial Ex. 225

("NYU Hospital remains seriously delinquent in its payments.").  NYU approved requisition 15

by June 30, 2005 in the amount of $800,874, rendering this amount due by July 30, 2005.  Trial

Ex. 252; Trial Tr. 116:6-14 (Jan. 5, 2011).  Requisition 16, in the amount of $486,194, appears to

have been received by NYU as of August 3, 2005.  Trial Ex. 252; Trial Tr. 116:15-117:20 (Jan.

5, 2011).  Based on the weight of evidence at trial, the Court concludes that requisition 16 was

---

[10] Despite the failure of HRH and NYU to sit down for the meeting contemplated by the Completion Agreement,
    HRH and NYU did meet to discuss current construction issues.  See Trial Tr. 178:7-12 (Jan. 5, 2011) (discussing
    meeting minutes issued on a regular basis on this project).  Neither party has argued, however, that these meetings
    constituted the meeting contemplated by the Completion Agreement.

also approved and notes that there is no evidence to suggest that NYU was unsatisfied with the work reflected in requisition 16.  Trial Ex. 235; Trial Ex. 252; Trial Tr. 116:15-117:20, 123:4-7, 177:1-3 (Jan. 5, 2011); Egeberg Dep. 291:22-292:7.  But see Berger Aff. ¶ 65 ("HRH's payment application 16R was never approved internally at NYU after its receipt from the architect, and payment was likewise withheld on account of HRH's failure to progress the work.").  Allowing for NYU's twelve day period to accept or deny a requisition, HRH was due to receive $486,194 on account of requisition 16 by September 14, 2005.  See Trial Ex. 1, Construction Agreement § 10.1.7.

As for requisition 17, dated July 31, 2005, it is unclear whether or when NYU received this requisition.  See Trial Ex. 250; Trial Tr. 4:17-21, 7:15-11:6 (Jan. 10, 2011).  Requisition 17 purports to claim reimbursement for work accomplished during the month of July in 2005 after Substantial Completion of phases 0 and 1 but before work commenced on phase 2.  Trial Ex. 250.

The evidence indicates that HRH made NYU aware of its failure to timely pay requisitions on many occasions, including a letter dated June 20, 2005.  See Trial Exs. 216, 217, 220, 225.  Eventually, HRH sent NYU a letter of default on August 22, 2005, informing NYU that failure to pay the outstanding requisitions constituted a breach of contract permitting HRH to suspend performance if NYU did not cure the default within ten days.  Trial Ex. 243.

### B.    Litigation in New York State Court

On November 10, 2005, NYU filed a complaint against HRH in the Supreme Court of the State of New York.  In its complaint, NYU asserted only one cause of action against HRH for its failure to progress with work after Substantial Completion was achieved in June of 2005.  In subsequent briefing, NYU has explained that its breach of contract claim is based on theories of

constructive abandonment and work stoppage.  HRH responded to NYU's complaint with

counterclaims for breach of contract, quantum meruit, and unjust enrichment.

Subcontractor Curtis filed its own complaint in state court against HRH and NYU to

seek, under a variety of legal theories, Curtis's share of the unpaid contract requisitions and to

foreclose upon a mechanic's lien against NYU for that unpaid amount plus other damages.  On

February 19, 2009, the state court issued a decision dismissing Curtis's claims arising in

quantum meruit and New York General Business Law § 756, leaving only two causes of action:

(1) a mechanic's lien claim against both NYU and HRH, and (2) a "hardship" or tortious

interference claim against HRH.  Curtis Partition Corp. v. HRH Constr., LLC, 2009 N.Y. Misc.

LEXIS 329, 2009 WL 415550, 2009 N.Y. Slip Op. 50272U, at *7-11 (N.Y. Sup. Ct. Feb. 19,

2009).    NYU responded to Curtis's complaint by filing various counterclaims against Curtis,

including willful exaggeration of the Curtis mechanic's lien and a third-party beneficiary claim

seeking damages for Curtis's breaches of the subcontract between HRH and Curtis.  NYU also

sought indemnification against HRH for any damages NYU might owe to Curtis.

## C.    Removal from State Court

After HRH filed for bankruptcy protection on September 6, 2009, HRH removed the state

court action to the United States District Court for the Southern District of New York,

whereupon this matter was referred to the bankruptcy court pursuant to the standing order of

referral dated July 10, 1984 (Ward, Acting C.J.).  Pursuant to letters filed on the docket in July of

2011, the parties consented to the entry of this decision as a final judgment.  See docket entries

37-39; 28 U.S.C. § 157(c)(2); Stern v. Marshall, 131 S. Ct. 2594 (U.S. 2011).  This decision

constitutes the Court's findings of fact and conclusions of law.

## DISCUSSION

### A.    The Parties and Applicable Law

NYU is a New York not-for-profit corporation and HRH is a New York limited liability

corporation.  Trial Ex. 1, Construction Agreement at 1; NYU Complaint ¶ 1; HRH Answer and

Counterclaims ¶ 31.  Curtis is a New Jersey corporation having its principal place of business in

New York.  Curtis Complaint ¶ 1.  Both the Construction Agreement and the subcontract

between HRH and Curtis are governed by the laws of New York.  Trial Ex. 1, Construction

Agreement §§ 22.2, 22.4; Trial Ex. 4, Subcontract § 18.5.  Not surprisingly then, the parties

agree that New York law applies to the instant dispute.

### B.    New York Law on Contracts

The elements of a cause of action to recover damages for breach of contract are (1) the

existence of a contact, (2) the plaintiff's performance under the contract, (3) the defendant's

breach of the contract, and (4) resulting damages.  Palmetto Partners, L.P. v. AJW Qualified

Partners, LLC, 921 N.Y.S.2d 260, 264 (N.Y. App. Div. 2d Dep't 2011) (citations omitted).  A

party's failure to perform results in the suspension of the complying party's obligation to

perform.  P.A. Bldg. Co. v. City of New York, 10 N.Y.3d 430, 437 (N.Y. 2008) (citations

omitted).  See also 17A AM JUR 2D CONTRACTS § 606 ("As a rule, a party first guilty of a

substantial or material breach of contract cannot complain if the other party subsequently refuses

to perform.  That party can neither insist on performance by the other party nor maintain an

action against the other party for a subsequent failure to perform.  This is because a material

breach relieves the other party of the obligation to perform.").  Where one party demands strict

performance as to time by another party, he must perform on his part all the conditions which are

requisite in order to enable the other party to perform his part, and a failure on the part of the

party demanding performance operates as a waiver of the time provision in the contract. <u>Walter Sign Corp. v. State</u>, 31 A.D.2d 729, 729-30 (N.Y. App. Div. 4th Dep't 1968) (citations omitted). <u>Accord</u> <u>Mosler Safe Co. v. Maiden Lane Safe Deposit Co.</u>, 199 N.Y. 479, 489 (N.Y. 1910).

Failure to make periodic payments due under a contract can constitute a breach entitling the counterparty to regard the contract as terminated. <u>See</u> <u>Paterno & Sons, Inc. v. New Windsor</u>, 43 A.D.2d 863, 864 (N.Y. App. Div. 2d Dep't 1974) (citations omitted). Section 276 of the Restatement of the Law of Contracts explains that an owner who fails to make timely payments excuses a contractor from further work until payments are made current. <u>See</u> <u>Tri-Mar Contractors, Inc. v. Itco Dry-Wall, Inc.</u>, 74 A.D.2d 601, 602 (N.Y. App. Div. 2d Dep't 1980). Unless a payment is delayed an unreasonably long time, the contractor must resume work when the payment is made. <u>See</u> <u>id.</u>

The unambiguous language of uncontested, valid contracts must be enforced. <u>Weiser v. Exeter Capital Partners LLC</u>, 890 N.Y.S.2d 371, 2009 N.Y. Slip Op. 51406U, at *6 (N.Y. Sup. Ct. June 11, 2009) (citations omitted). If an agreement on its face is reasonably susceptible of only one meaning, a court is not free to alter the contract to reflect its personal notions of fairness and equity. <u>Krystal Investigations & Sec. Bur., Inc. v. United Parcel Serv., Inc.</u>, 35 A.D.3d 817, 818 (N.Y. App. Div. 2d Dep't 2006) (citations omitted).

## C.    Unpaid Requisitions Sought by HRH

Given the chronology of events, the Court will first address HRH's claim that NYU breached the contract by failing to timely pay requisitions approved in the late spring and summer of 2005.

Each of these requisitions had a different submission date and thus triggered different deadlines for payment. By May 19, 2005, NYU had approved requisition 14, which HRH had

13

submitted for its work on the construction project during the month of April 2005.  Pursuant to

section 10.2 of the Construction Agreement, NYU was required to pay HRH within thirty days

of its approval, making payment for requisition 14 due by June 18, 2005.  Trial Ex. 1,

Construction Agreement §§ 10.2, 13.1.  See also Trial Ex. 3, Completion Agreement ¶ 2(d); Trial

Tr. 122:20-24 (Jan. 5, 2011).  Adding the Construction Agreement's ten-day cure period, NYU

was in breach by June 28, 2005 for failure to pay.  It is undisputed that NYU never paid HRH for

requisition 14.  Trial Tr. 114:10-14 (Jan. 5, 2011).  By letter dated June 20, 2005, HRH notified

NYU that NYU "remains seriously delinquent in its payments."  Trial Ex. 225.  It is similarly

undisputed that NYU never paid HRH for requisitions 15 and 16, despite NYU's approval of

these requisitions.  Trial Tr. 115:25-117:25 (Jan. 5, 2011).

Unlike requisitions 14 through 16, requisition 17 is disputed as NYU claims to not have

received it.  Trial Tr. 4:4-25 (Jan. 10, 2011).  While there is documentation proving that NYU

received requisitions 14 through 16, with signatures and dates affixed by NYU, there is no such

documentary evidence for requisition 17.  See Trial Exs. 129, 130, 131, 141, 250A.  Instead,

HRH provided only limited testimony on the subject, none of which established that requisition

17 was received and approved by NYU.  Given the deficiencies in documentary support and the

timing of requisition 17—purportedly submitted on or after July 31, 2005, at which point the

relationship among the parties had deteriorated significantly and a requisition approval was

unlikely—the Court will not consider requisition 17 as having been submitted to and approved

by NYU.

Under the terms of the Construction Agreement, HRH is entitled to payment on approved

requisitions 14, 15 and 16 unless NYU somehow was relieved of its obligation to pay such

requisitions.  NYU offers four theories to support its failure to pay the approved requisitions:

14

(1) HRH's failure to proceed with phase 2, (2) HRH's unsatisfactory or disputed job progress,

(3) HRH's breach prior to Substantial Completion, and (4) HRH's failure to provide formal

notice to NYU of an intended suspension of work.

      1.      <u>Alleged Failure to Proceed with Phase 2</u>

      NYU contends that HRH abandoned the construction project in June of 2005 by failing to

proceed with phase 2. Berger Aff. ¶ 63; NYU Post-Trial Brief ¶ 130. NYU argues, therefore,

that it was under no obligation to pay requisitions that became due at or after that time.

      To recover on the ground of abandonment, an owner must establish that the contractor is

responsible for delays which are so unreasonable that they connote a relinquishment of the

contract by the contractor with the intention of never resuming it. <u>Corinno Civetta Constr. Corp.

v. New York</u>, 67 N.Y.2d 297, 312-13 (N.Y. 1986) (citations omitted). "To establish

abandonment of a contract by conduct, it must be shown that the conduct is mutual, positive,

unequivocal, and inconsistent with the intent to be bound. Generally, a finding of . . .

abandonment will be based upon clear, affirmative conduct by at least one of the parties that is

entirely at odds with the contract." <u>EMF Gen. Contr. Corp. v. Bisbee</u>, 6 A.D.3d 45, 49-50 (N.Y.

App. Div. 1st Dep't 2004) (citations omitted). The party who asserts abandonment has the

burden of establishing it since the termination of a contract is not presumed. <u>Rosiny v. Schmidt</u>,

185 A.D.2d 727, 732 (N.Y. App. Div. 1st Dep't 1992). <u>See also</u> <u>Armour & Co. v. Celic</u>, 294

F.2d 432, 435-36 (2d Cir. 1961) (setting forth the law in New York for abandonment of

contracts); <u>Benson v. RMJ Sec. Corp.</u>, 683 F. Supp. 359, 373 (S.D.N.Y. 1988) (same).

      NYU has not provided sufficient evidence to meet its burden to establish abandonment

by HRH for failure to proceed with phase 2. It is undisputed that the Completion Agreement was

designed to help the parties overcome the problems previously plaguing this project by reaching

an understanding on a variety of important matters going forward, including the scheduling of

payments, the scope and timing of work on phase 2, and a new deadline for Substantial

Completion of phases 0 and 1.  Of particular relevance here, the Completion Agreement—

drafted by NYU—specifically provided that the parties were to "meet (prior to the start of [phase

2]) to negotiate and resolve remaining issues between them, including the schedule for

completion of the remaining Work."  The evidence at trial established that no such meeting

occurred.  Without such a meeting, NYU cannot prevail on its claim that HRH abandoned the job

by failing to move forward with phase 2.

In fact, the evidence suggests that HRH attempted to move forward with the project

several times during the summer of 2005.  In letters from June through August of 2005, HRH

repeatedly requested meetings and clearance to proceed with phase 2.  See Perlman v. M. Israel

& Sons Co., 306 N.Y. 254, 257 (N.Y. 1954) (refusal to accept tender of performance is a breach

of contract that excuses further performance).  The evidence reveals that HRH, on multiple

occasions, conveyed its intent to finish the project.  Indeed, the change order request of August 2,

2005, was provided to NYU in contemplation of continued performance.

NYU argues that the meeting referenced in the Completion Agreement was not a

condition precedent because the relevant contractual language lacked the unmistakable language

of "if" or "unless and until."  NYU Post-Trial Brief ¶ 136.  However, the meaning of the

Completion Agreement is unmistakable from its plan language: "Following Substantial

Completion of Phase 0 and Phase 1 of the Work, the Owner and Contractor will meet (prior to

the start of the next phase of the Work) to negotiate and resolve remaining issues between them,

including the schedule for completion of the remaining Work."  Trial Ex. 3, Completion

Agreement ¶ 3 (emphasis added); Weiser, 2009 N.Y. Slip Op. 51406U, at *6 (the unambiguous

language of uncontested, valid contracts controls).  This Court's ruling is consistent with the

state court's understanding, prior to removal, of the parties' obligations under the Completion

Agreement.  See Curtis Partition, 2009 N.Y. Slip Op. 50272U, at *2 ("The parties also agreed

that once Phases 0 and 1 were substantially complete, they would negotiate a plan for the

commencement of work on Phase 2 of the project.").

Given the language of the Completion Agreement, there is no doubt of the parties' intent,

and NYU has not presented any evidence that would dictate a contrary result.[11]  See

Oppenheimer & Co. v. Oppenheim, 86 N.Y.2d 685, 691 (N.Y. 1995) ("Though the court may

regret the harshness of such a condition, as it may regret the harshness of a promise, it must,

nevertheless, generally enforce the will of the parties unless to do so will violate public policy.").

Indeed, even if there were some ambiguities in the language of contract on this issue, such

ambiguities would be construed against NYU as the drafter of the agreement.  See Matter of

Liberty Mut. Fire Ins. Co. v Malatino, 75 A.D.3d 967, 969-70 n.4 (N.Y. App. Div. 3d Dep't

2010) (citing Guardian Life Ins. Co. of Am. v Schaefer, 70 N.Y.2d 888, 890 (1987)); State of

New York v. Industrial Site Servs., Inc., 862 N.Y.S.2d 118, 124 (N.Y. App. Div. 3d Dep't 2008)

(citations omitted); Burgos v. Metro-North Commuter R. R., 836 N.Y.S.2d 76, 77 (N.Y. App.

Div. 1st Dep't 2007) (citing Jacobson v. Sassower, 66 N.Y.2d 991, 993 (1985)).  Thus, as NYU

cannot establish that the contract required HRH to proceed with phase 2, NYU's abandonment

claim must fail.

NYU offers an alternative theory by arguing that HRH's change order request of August

2, 2005 was an anticipatory breach, or a condition precedent to continued performance.  See

---

[11] The testimony of NYU's most senior official on the project, Mr. Egeberg, strongly confirms the parties' intent to
meet before moving forward with phase 2.  See Egeberg Dep. 227:10-14 ("[T]he parties needed to sit down and
figure this out.  There was no time frame other than as soon as possible for both of us to figure out what we were
going to do to continue.").

DeCesare Aff. ¶ 48; Trial Tr. 104:10-14, 106:1-17 (Jan. 5, 2011).  More simply, NYU contends

that HRH refused to proceed with phase 2 unless NYU agreed to the change order request of

August 2, 2005.  But NYU's theory is inconsistent with its own claim that "HRH was in breach

of the Construction Agreement by failing to give NYU an unequivocal demand for timely

payment prior to its work stoppage."  NYU Post-Trial Brief ¶ 133.  NYU cannot have it both

ways.

Moreover, the evidence strongly suggests that the change order request was not seriously

considered by NYU.  One of NYU's witnesses testified that she did not read the proposed

change order of August 2, 2005 until four years later, and another witness explained that he did

not read it "in depth."  Trial Tr. 99:6-100:20 (Jan. 5, 2011); Egeberg Dep. 243:12-244:7.  NYU

also argues that the change order request demand for an additional $4,153,566 to complete the

project was patently unreasonable and not a basis for further negotiation.  NYU's position is,

however, difficult to reconcile with NYU's assertion that its reasonable costs to complete the

project were $3,678,830, or some 13% less than HRH's demand.[12]  Wright Aff. ¶ 23 (Dec. 10,

2010); NYU Post-Trial Brief ¶ 141.  Given all these circumstances, the Court rejects NYU's

theory of anticipatory breach as inconsistent with the events of the summer 2005 and the

contractual burdens imposed on each party pursuant to the Completion Agreement.

NYU also maintains that the Court should reject HRH's claim for unpaid requisitions

because HRH failed to provide the ten days' written notice required when a party threatened to

suspend work for nonpayment.  NYU Post-Trial Brief ¶¶ 80-82; Berger Aff. ¶ 68 (citing Trial

Ex. 1, Construction Agreement § 10.3).  But NYU's argument misses the point.  HRH did not

unilaterally suspend work on the project.  The next work contemplated by the project was

---

[12] After including NYU's termination fees and expenses through February of 2010 in the amount of $350,931, this
percentage shrinks to a modest 3%.  See Wright Aff. ¶ 25; NYU Post-Trial Brief ¶ 141.

phase 2, and HRH was not obligated to begin work on phase 2 until the parties had met pursuant

to the Completion Agreement.  As no such meeting occurred, NYU cannot successfully argue

that HRH suspended work on the job.  The contract having been terminated, however, HRH is

now entitled to seek payment of these requisitions pursuant to the contract's termination

provision.  Trial Ex. 1, Construction Agreement, Article 17.

Separate and apart from the parties' contractually mandated meeting, HRH persuasively

presents an alternative theory for recovery of its unpaid requisitions: NYU's interference with

HRH's ability to perform its ongoing contractual obligations.  Each party to a construction

contract impliedly agrees not to hinder or obstruct the other's performance.  Wolff & Munier,

Inc. v. Whiting-Turner Contracting Co., 946 F.2d 1003, 1007 (2d Cir. 1991) (citations omitted).

See also Young v. Whitney, 111 A.D.2d 1013, 1014 (N.Y. App. Div. 3d Dep't 1985) (citations

omitted) ("[T]he law implies in every contract that one party will not prevent the other party's

performance.").  The credible evidence at trial establishes that NYU impeded HRH's ability to

perform in three fundamental ways.  First, HRH contacted general contractor Bovis about

replacing HRH on the job and gave Bovis permission to communicate directly with HRH's

subcontractors, thereby frustrating HRH's ability to work with subcontractors who expected that

HRH had been or likely would be replaced.  Second, NYU failed to timely pay outstanding

requisitions, especially requisitions 14 and 15 due in June and July respectively, further

frustrating HRH's ability to obtain cooperation from these same unpaid subcontractors.  Third,

NYU failed to finalize drawings for phase 2 as of July 27, 2005, which made it difficult to

proceed with work on phase 2.

All of these actions collectively obstructed HRH's ability to perform, even if

performance was required to proceed with phase 2.  Savin Bros., Inc. v. State, 62 A.D.2d 511,

516 (N.Y. App. Div. 4th Dep't 1978) ("In every express contract for the performance of construction work there exists an implied term that the owner or the party for whom the work is to be performed will not obstruct but, on the contrary, will facilitate performance."), affirmed, 47 N.Y.2d 934 (N.Y. 1979); Bialo v. Walter Lawlor, Inc., 160 A.D.2d 559, 560 (N.Y. App. Div. 1st Dep't 1990) ("A duty is imposed upon an employer not to interfere with the prosecution of the work of his contractor.").  Accord Lower v. Vill. of Watkins Glen, 17 A.D.3d 829, 831 (N.Y. App. Div. 3d Dep't 2005) ("A plaintiff seeking to maintain action for breach or nonperformance of contract must demonstrate that tender of his or her own performance was made, unless tender was waived or the necessity for such tender was obviated by acts of the other party amounting to an anticipatory breach of the contract or establishing that such party would be unable to perform.") (citations omitted).

The facts of this case are quite similar to those recently addressed in Plainview S. & S. Concrete Co. v. NVNG Dev. Corp., 151 A.D.2d 654 (N.Y. App. Div. 2d Dep't 1989).  In Plainview, the plaintiff was contracted to do construction work on a building owned by the defendant.  Id. at 655.  The owner failed to complete certain preparatory work that it was responsible for doing, thereby frustrating the plaintiff's ability to continue the work.  Id.  The owner then hired other contractors to perform the work which the plaintiff had been obligated to perform under their contract.  Id.  The Plainview court held that, under these circumstances, the owner could not successfully assert that the plaintiff abandoned its obligations under the contract.  Id.  Moreover, the Plainview court held that the owner, in hiring other contractors before the plaintiff could complete its work, breached the contract by effectively preventing the plaintiff from performing.  Id.   As in Plainview, owner NYU here frustrated HRH's ability to perform and, therefore, cannot successfully assert that HRH abandoned its contractual

20

obligations.  Id.; see Michael G. Buck & Son Constr. Corp. v. Poncell Constr. Co., 217 A.D.2d

925, 926 (N.Y. App. Div. 4th Dep't 1995) (finding the defendant breached the contract by

wrongfully ordering plaintiff off the job at a time when plaintiff was in "substantial

compliance").

     2.    Unsatisfactory or Disputed Job Progress

NYU contends that it was entitled to withhold payments on account of the approved

requisitions 14 through 16 because of "unsatisfactory or disputed job progress."  Berger Aff.

¶ 64.  But see Trial Tr. 118:1-119:4, 122:20-24 (Jan. 5, 2011).  NYU further argues that

requisitions 14 and 15 were approved "only in anticipation that HRH would continue working."

Berger Aff. ¶ 65.  These arguments represent a strained and unsupported reading of Construction

Agreement section 10.1.7, which allows NYU to withhold payment only on account of disputed

requisitions, and of the Completion Agreement.  The evidence makes clear that requisitions 14

through 16 were never disputed by NYU, and requisitions 14 and 15 were, in fact, affirmatively

approved by NYU.  The Court rejects NYU's argument as inconsistent with the contract,

particularly given the provisions of the Completion Agreement—discussed above—setting forth

the parties obligation to meet before moving forward with phase 2.

     3.    Alleged Breach Prior to Phase 2

NYU has suggested that it should prevail because HRH breached the contract by virtue of

the six-day delay in reaching Substantial Completion and because NYU devoted some of its own

personnel to achieving Substantial Completion by June 21, 2005.  The Court rejects NYU's

argument.

As a threshold matter, this theory of breach was presented for the first time in this Court

at trial and is inconsistent with NYU's long held view that HRH breached the contract by failing

to move forward with phase 2 of the work. <u>See</u> NYU Complaint ¶ 10 ("Following substantial completion of Phases 0 and 1 on or about June 15, 2005, construction progress ceased . . . ."); NYU Post-Trial Brief ¶ 58 (claiming that NYU "was the first party to declare a breach of the Construction Agreement, pursuant to written notice to HRH dated August 17, 2005") (citing Trial Ex. 36, which provides that HRH is in default for its "continuing lack of progress"). <u>See also</u> Trial Tr. 58:9-20 (Jan. 5, 2011) ("It has no place in this case, Your Honor, because they've never made a claim. . . .  It's not in their complaint.") (statement of HRH's counsel at opening of trial regarding completion of phases 0 and 1).  As such, this new theory of breach is not properly before the Court.  <u>See</u> <u>S.E.C. v. Tambone</u>, 597 F.3d 436, 450 (1st Cir. 2010) ("A party cannot switch horses mid-stream, changing its theory of liability at a later stage of the litigation in hopes of securing a swifter steed."); <u>Armstrong Cork Co. v. Lyons</u>, 366 F.2d 206, 209 n.3 (8th Cir. 1966) ("The plaintiff in his proof must ordinarily be confined to the cause of action set forth in his declaration or complaint, and must recover, if at all, on the case made therein."); <u>Auguste v. Dep't of Corrections</u>, 424 F. Supp. 2d 363, 368 (D. Conn. 2006) (declining to consider claims raised in memorandum response to motion for summary judgment, but not raised in original complaint).  <u>See also</u> <u>Opals on Ice Lingerie v. Bodylines, Inc.</u>, No. 99 CV 3761, 2002 WL 718850, at *4, 2002 U.S. Dist. LEXIS 10738, at *13-14 (E.D.N.Y. Mar. 4, 2002); <u>Beckman v. U.S. Postal Service</u>, 79 F. Supp. 2d 394, 408-10 (S.D.N.Y. 2000); <u>Dir. Gen. of India Supply Mission v. S.S. Janet Quinn</u>, 335 F. Supp. 1329, 1338 (S.D.N.Y. 1971); <u>In re Freeman</u>, 30 B.R. 704, 706-07 (Bankr. W.D. La. 1983).

In any event, NYU's new theory of breach is not supported by the evidence at trial. According to the Completion Agreement, HRH was to reach Substantial Completion by June 15, 2005.  Substantial Completion was to include all work necessary to obtain approval from the

Department of Health.  The parties were aware that the Department of Health was scheduled to

review the facilities on June 21, 2005.  This inspection had been scheduled at least thirty days

prior.  Trial Tr. 91:4-92:3 (Jan. 5, 2011).  According to schedule, the Department of Health

visited the facilities on June 21, 2005, and NYU was given approval for full use and occupancy

of the facilities.  Given the ten-day cure period found in section 17.3 of the Construction

Agreement, a six-day delay in reaching Substantial Completion does not constitute a default or

breach.  Moreover, Substantial Completion was reached in time for a successful inspection by

the Department of Health in compliance with the purpose of the June 15, 2005 deadline

articulated in the Completion Agreement.  As for NYU's use of its own staff, the mere use of

such personnel does not, by itself, constitute a breach and is insufficient under these

circumstances establish abandonment by HRH.  See Savin Bros., 62 A.D.2d at 516 (every

express construction contract contains an implied term that the owner will facilitate the

contractor's performance).  Not surprisingly, NYU did not allege a breach of the contract at the

time of these events—compare Trial Exs. 224, 242, 245—nor has NYU asserted damages in

connection with the completion of phases 0 and 1.  See Wright Aff. ¶¶ 13-15, 22-23; NYU Post-

Trial Brief ¶¶ 109-120.

        4.      Alleged Lack of Formal Notice Prior to Suspension of Work

        Finally, NYU complains that HRH failed to give NYU notice of its intent to suspend

work for non-payment.  See NYU Post-Trial Brief ¶¶ 80-82; Berger Aff. ¶ 68.  In support of this

position, NYU points to section 10.3 of the Construction Agreement, which reads: "[HRH] may

suspend the Work until payment of the amount owing has been received after providing [NYU]

written notice and an opportunity to cure at least ten (10) days before the intended suspension.

Such notice shall (a) inform [NYU] that payment of undisputed amounts has not been received,

and (b) state the intent of [HRH] to suspend the Work for non-payment." NYU Post-Trial Brief

¶ 81; Trial Ex. 1, Construction Agreement § 10.3.

While there is substantial evidence that HRH made NYU aware, on numerous occasions,

of NYU's failure to timely pay requisitions, including a letter dated June 20, 2005, the Court is

not aware of a notice from HRH to NYU stating HRH's intent to suspend performance for non-

payment until August 22, 2005. See Trial Ex. 37. For the reasons set forth above, however, the

lack of earlier notice does not undermine HRH's claim for payment of requisitions 14, 15, and 16

because HRH did not have an obligation to move forward with phase 2 prior to the August 22,

2005 notice. Even accepting that HRH employees may have orally expressed some

unwillingness about moving forward with the job, the Construction Agreement is abundantly

clear about NYU's obligation to timely pay requisitions for completed work where such

requisitions had been approved by NYU.[13]

## E.    Quantum Meruit and Unjust Enrichment

HRH's remaining causes of action against NYU arise in quantum meruit and unjust

enrichment. These causes of action apply only when a written, valid, and enforceable contract

does not exist. See Steven Strong, 303 A.D.2d at 882. HRH's work for NYU was done pursuant

to their Construction Agreement and subsequent Completion Agreement, and neither party has

challenged the validity or enforceability of these contracts. Therefore, as the state court

previously recognized, HRH's claims for quantum meruit and unjust enrichment must fail,

including its claim for payment of requisition 17. See Curtis Partition, 2009 N.Y. Slip Op.

---

[13] Although HRH urges the Court to take a negative inference from Mr. Egeberg's failure to appear at trial as a witness, it would not appear necessary to do so, because Mr. Egeberg's deposition testimony supports the decision reached by the Court. See Revson v. Cinque & Cinque, 221 F.3d 71, 81 (2d Cir. 2000) ("It is well-settled that a party's failure to call a witness may permissibly support an inference that that witness's testimony would have been adverse.").

50272U, at *6 ("HRH's admission that its work on the Project is governed by the Construction

Agreement with NYU precludes a claim for quantum meruit or unjust enrichment because, under

New York law, the existence of a written contract covering the particular subject matter of the

claims asserted precludes recovery in quasi contract.") (citations omitted).  See also Steven

Strong, 303 A.D.2d at 882.

## F.    Curtis's Hardship Claim

Curtis brings a hardship claim against HRH in which it seeks damages for various delays

in the work and lack of an adequate storage area on site.  See Trial Tr. 64:16-65:2 (Jan. 5, 2011);

Trial Tr. 89:4-18 (Jan. 7, 2011) (explaining that its hardship claim is essentially one for breach of

contract).   See also Curtis Partition, 2009 N.Y. Slip Op. 50272U, at *7-8 (discussing Curtis's

claims arising in breach of contract and quantum meruit).

Curtis's claim is problematic because the relevant contracts contain provisions precluding

such damages.  These include no-delay provisions and drawings that reflect the amount of space

available for the project.[14]  See Trial Ex. 1, Construction Agreement §§ 5.4-5.6, Ex. A; Trial Ex.

4, Subcontract §§ 7.2(c-e), 13.1(a).  Curtis relies upon Abax Inc. v. N.Y. City Hous. Auth., 282

A.D.2d 372, 373 (N.Y. App. Div. 1st Dep't 2001) for the proposition that the no-delay damages

clauses do not apply because the interference with Curtis's performance was egregious, in bad

faith, willful, or grossly negligent.  The evidence does not in any way support such a factual

finding, however, and the Court declines to award the "exemplary damages" requested by Curtis.

See Curtis Partition, 2009 N.Y. Slip Op. 50272U, at *6-7 (exemplary damages not authorized in

breach of contract action where only a private wrong and not a public right is involved) (citing

Cross v. Zyburo, 185 A.D.2d 967, 968 (N.Y. App. Div. 2d Dep't 1992)).

---

[14] Notably, HRH has not asserted a claim for inadequate storage against NYU.

### G.    Claims of Subcontractor Curtis

On October 28, 2005, one day after NYU notified HRH of its termination, Curtis filed a

mechanic's lien on NYU's property.  See Trial Ex. 45.  Curtis now seeks to foreclose on its

mechanic's lien to the extent that it is not otherwise made whole.  Somewhat relatedly, Curtis

also claims that any money owed to Curtis as a subcontractor is held in trust for Curtis pursuant

to Article 3-A of New York's Lien Law.

### 1.    The Curtis Mechanic's Lien

Mechanic's liens "may be enforced against the property specified in the notice of lien and

which is subject thereto and against any person liable for the debt upon which the lien is

founded."  Martirano Constr. Corp. v. Briar Contracting Corp., 104 A.D.2d 1028, 1030 (N.Y.

App. Div. 2d Dep't 1984) (quoting N.Y. Lien Law § 24).  It is well established that a mechanic's

lien of a subcontractor will attach only to funds due and owing to the general contractor at the

time of its filing, or which may thereafter become due and owing.  Electric City Concrete Co. v.

Phillips, 100 A.D.2d 1, 4 (N.Y. App. Div. 3d Dep't 1984); Curtis Partition, 2009 N.Y. Slip Op.

50272U, at *10.  The rights of lienors are derivative of the general contractor and are restricted

to satisfaction out of the amount established to be due and owing from the owner to the general

contractor.  Curtis Partition, 2009 N.Y. Slip Op. 50272U, at *10 (citing Electric City Concrete,

100 A.D.2d at 4; Timothy Coffey Nursery/Landscape, Inc. v. Gatz, 304 A.D.2d 652, 653-54

(N.Y. App. Div. 2d Dep't 2003)).

A subcontractor bears the burden of demonstrating that there is money due and owing to

the general contractor from the owner based on the primary contract.  Timothy Coffey

Nursery/Landscape, Inc. v. Gatz, 304 A.D.2d at 654 (citations omitted).  "If labor is performed

for, or materials furnished to, a contractor or subcontractor for an improvement, the lien shall not

be for a sum greater than the sum earned and unpaid on the contract at the time of filing the

notice of lien, and any sum subsequently earned thereon."  N.Y. Lien Law § 4(1).

A lien becomes vested upon filing and subsequent failure to perform does not preclude or

reduce recovery.  104 Constr., Inc. v. R.T. Golf Assocs., L.P., 270 A.D.2d 817, 819 (N.Y. App.

Div. 4th Dep't 2000) (citations omitted).  A mechanic's lien will not be defeated by the

subsequent abandonment of the project by the general contractor even though payments to third

parties in excess of the original contract price may be required by the owner to complete the

construction.  Albert J. Bunce, Ltd. v. Fahey, 73 A.D.2d 632, 632 (N.Y. App. Div. 2d Dep't

1979) (citations omitted).

At trial, Curtis presented little evidence, relying predominately on the evidence presented

by general contractor HRH.  For the reasons set forth above, the Court concludes that Curtis is

entitled to payment from requisitions 14, 15 and 16 for the monies owed to Curtis under those

requisitions received and approved by NYU but denies its claim for requisition 17 and its

hardship claim.  Because no amount due and owing will remain for Curtis after judgment is

entered in connection with this decision, Curtis's request to foreclose on its mechanic's lien is

denied.[15]  See C.B. Strain & Son, Inc. v. J. Baranello & Sons, 90 A.D.2d 924, 925 (N.Y. App.

Div. 3d Dep't 1982) ("The rights of lienors are derivative of those of the general contractor and

are restricted to satisfaction out of the amount established to be due and owing from the owner to

the general contractor.") (citations omitted).

---

[15] Relatedly, the Court rejects NYU's claim against Curtis for willfully exaggerating its mechanic's lien.  To prevail
on such a claim requires proof that the lienor deliberately and intentionally exaggerated the lien amount.  Barden
& Robeson Corp. v. Czyz, 245 A.D.2d 599, 601 (N.Y. App. Div. 3d Dep't 1997) (citing Pratt General Contractors
v. Trappey, 177 A.D.2d 566, 568 (N.Y. App. Div. 2d Dep't 1991)).  While it is true that Curtis's allegations of
damages have been inconsistent and that Curtis partially waived its liens for the period ending March 31, 2005,
see Trial Ex. 46, the Court concludes that the evidence falls short of establishing deliberate and intentional
exaggeration, particularly given the uncertainties of the project at the time the lien was created in October of
2005.

2.      Applicability of Article 3-A

The Court concludes that the monies owed to Curtis under requisitions 14 through 16 should be paid by NYU directly to Curtis, rather than through HRH, pursuant to Article 3-A of New York's Lien Law (N.Y. Lien Law §§ 70 – 79-a).  Article 3-A "create[s] trust funds out of certain construction payments or funds to assure payment of subcontractors, suppliers, architects, engineers, laborers, as well as specified taxes and expenses of construction."  Canron Corp. v. City of New York, 89 N.Y.2d 147 (N.Y. 1996) (citation omitted).  The purpose of the trust is to "safeguard the rights of those working on construction projects by providing for the payment of obligations incurred in performing the contract."  Kemper Ins. Cos. v State of New York, 70 A.D.3d 192, 196 (N.Y. App. Div. 3d Dep't 2009) (quoting AMG Indus. v. A.J. Eckert Co., 279 A.D.2d 717, 719 (N.Y. App. Div. 3d Dep't 2001)).  With respect to trusts for which a contractor is trustee, "trust claims" means claims arising at any time for payments for which the trustee is authorized to use trust funds as provided in the Lien Law.  N.Y. Lien Law § 71(3)(b).

According to the Lien Law, "every trust claim shall be deemed to be in existence from the time of the making of the contract or the occurrence of the transaction out of which the claim arises."  N.Y. Lien Law § 71(5).  The trust res consists not only of funds already received, but also of the right to receive funds in the future, including prospective payments that are contingent upon the trustee's future performance of its contractual obligations.  Kemper Ins., 892 N.Y.S.2d at 600 (citing N.Y. Lien Law § 70(1)(a); Canron, 89 N.Y.2d at 156).  See also RLI Ins. Co. v. N.Y. State DOL, 97 N.Y.2d 256, 262 (N.Y. 2002) ("As a matter of statutory construction and under our precedents, even before funds are 'due or earned,' they become assets of an article 3-A trust.")

A contractor does not have a sufficient beneficial interest in the moneys, due or to

become due from the owner under the contract, to give him a property right in them, except

insofar as there is a balance remaining after all subcontractors and other statutory beneficiaries

have been paid. Aquilino v. United States, 10 N.Y.2d 271, 282 (N.Y. 1961). Once an Article 3-

A trust comes into existence, its funds may not be diverted for non-trust purposes, and the trust

continues until all trust claims have been paid or discharged, or all assets have been applied for

trust purposes. RLI Ins., 97 N.Y.2d at 262-63 (citations omitted).

Here, the Court finds that Curtis met its burden to demonstrate that Curtis performed

under its subcontract and pursuant to requisitions 14, 15, and 16 that were received and approved

by NYU. The operation of Article 3-A of the Lien Law creates a trust to ensure payment for the

services rendered by Curtis as a subcontractor on the construction project.[16] There does not

appear to be any dispute among the parties that Article 3-A applies to the monies owed to

subcontractor Curtis and, therefore, the monies owed to Curtis for these requisitions should be

paid directly to Curtis by NYU.[17]

## H.    Third-Party Beneficiary and Indemnification

The Court rejects the two remaining claims in this case, both of which are asserted

against Curtis by NYU. In the first, NYU argues that Curtis is liable to NYU under an

indemnification provision for any failure by Curtis to proceed with and complete its work on the

construction project. Verified Answer, Counterclaims and Cross-Claim of Defendant NYU

Hospitals Center ¶¶ 35-36. In addition, NYU seeks recovery against Curtis as a third-party

---

[16] NYU will pay Curtis directly for any monies owed to Curtis on these three requisitions and pay the remaining balance owed on these requisitions to HRH.

[17] This conclusion is supported by the fact that NYU is holding ten percentage retainers otherwise payable to Curtis under its subcontract at article 10(h). See Trial Ex. 4, Subcontract § 10.1(h).

29

beneficiary for Curtis's breach of the Curtis subcontract, despite the fact that there is no contract between NYU and Curtis.[18]  See Berger Aff. ¶ 7; Egeberg Dep. 279:9-11.  NYU argues that owners of construction projects are considered intended third-party beneficiaries of the general contractor's subcontracts even when the identity of the third-party beneficiary is not specifically set forth in the subcontract.  See NYU Pre-Trial Memorandum of NYU Hospitals Center and New York University 6 (citing Finch, Pruyn & Co. v. M. Wilson Control Servs., 239 A.D.2d 814, 815 (N.Y. App. Div. 3d Dep't 1997)).  However, NYU has not met its burden of proof with respect to its indemnification and third-party beneficiary claims against Curtis.  Neither the indemnification provisions in the contracts nor any theory of implied indemnification can be maintained against Curtis because NYU neither proved that it suffered grave injuries nor established "active negligence" or "active fault" on the part of Curtis.  See Potter v. M.A. Bongiovanni, Inc., 271 A.D.2d 918, 919 (N.Y. App. Div. 3d Dep't 2000) (discussing contractual indemnification and common-law indemnity); Finch, Pruyn, 239 A.D.2d at 815-18 (discussing third-party beneficiaries and "active negligence"); Kozerski v. Deer Run Homeowners Ass'n, 217 A.D.2d 841, 843 (N.Y. App. Div. 3d Dep't 1995) (discussing implied indemnification and "active fault").  See also Westbank Contr., Inc. v. Rondout Val. Cent. School Dist., 46 A.D.3d 1187, 1189 (N.Y. App. Div. 3d Dep't 2007) ("The right to indemnification 'arises out of a contract which may be express or may be implied in law to prevent a result which is regarded as

---

[18] The only contract to which Curtis is a party in connection with this project is the subcontract between Curtis and HRH.  See Curtis Partition, 2009 N.Y. Slip Op. 50272U, at *7; Trial Ex. 4.  Indeed, the state court has already ruled that Curtis could not assert a breach of contract claim against NYU without a contract between Curtis and NYU: "Because there is no contract between NYU and Curtis, as a matter of law, NYU may not be held liable for breach of contract . . . ."  Curtis Partition, 2009 N.Y. Slip Op. 50272U, at *7.  See also id. at *8 ("Curtis's argument ignores the express language in the governing agreements stating that none of HRH's subcontracts with its subcontractors shall create any contractual relationship between NYU and those subcontractors, ignores the fact that NYU was not a party to the subcontract between HRH and Curtis, and misrepresents that HRH acted as nothing more than an advisor on the Project.").  The state court also concluded that there is no privity of contract between NYU and Curtis.  Id. at *8-9.

unjust or unsatisfactory.'") (quoting <u>Rosado v. Proctor & Schwartz, Inc.</u>, 66 N.Y.2d 21, 24 (N.Y. 1985)); <u>State Facilities Dev. Corp. v. Kallman & McKinnell, Russo & Sonder</u>, 121 A.D.2d 805, 806 (N.Y. App. Div. 3d Dep't 1986) ("Indemnity involves an attempt to shift the entire loss from one who is compelled to pay for a loss, without regard to his own fault, to another person who should more properly bear responsibility for that loss.") (quoting <u>County of Westchester v. Welton Becket Associates</u>, 102 A.D.2d 34, 47 (N.Y. App. Div. 2d Dep't 1984), <u>affirmed</u>, 66 N.Y.2d 642 (N.Y. 1985)).

## I.   Damages

The Construction Agreement explains how damages are to be calculated if NYU terminates for convenience or cause.  "In the case of such termination or deletion, the Contractor shall be entitled to be reimbursed by the Owner for [c]osts of the [w]ork properly due and owing to the Contractor under the terms of this Agreement for Work performed up to and including the date of such termination or deletion . . . ."  Trial Ex. 1, Construction Agreement § 17.4.  Based on the analysis set forth above, the Court determines that NYU terminated for convenience, not based upon cause such as abandonment.[19]  Accordingly, section 17.4 of the Construction Agreement entitles HRH to be reimbursed by NYU for the work described in requisitions 14 through 16, and NYU is not entitled to damages of its own.  <u>See</u> <u>400 15th St., LLC v Promo-Pro, Ltd.</u>, 2010 WL 3529466, 2010 N.Y. Misc. LEXIS 4339, 2010 N.Y. Slip Op. 51580U, at *6 (N.Y. Sup. Ct. Sept. 10, 2010) (citations omitted); <u>Fruin-Colnon Corp. v. Niagara Frontier Transp. Authority</u>, 180 A.D.2d 222, 233-34 (N.Y. App. Div. 4th Dep't 1992).[20]  The amounts sought by

---

[19] The mere fact that there is a termination for convenience clause does not mean that a party cannot be found to have breached the contract.  <u>Matter of RSG Caulking & Waterproofing Inc. v. J.P. Morgan Chase & Co.</u>, 13 Misc.3d 1218A, 2006 N.Y. Slip Op. 51902U, at *8 (N.Y. Sup. Ct. 2006).

[20] In the alternative, the Court finds that NYU breached the contract for failure to make timely payments and that HRH is entitled to damages for such a breach once HRH sent its default letter of August 22, 2005.

HRH on these three requisitions are $684,889, $800,874, and $486,194, respectively.  Trial Exs.

129-131.  The amounts awarded to HRH must be reduced, however, by the amounts that must be

directly paid by NYU to Curtis as a subcontractor pursuant to Article 3-A, which appear to be

$77,867, $18,000, and $180,352, respectively.[21]  Trial Ex. 129 p. 2; Trial Ex. 130 p. 2; Trial Ex.

131 p. 2.  The damages awarded to HRH must also be reduced by the amounts requested by

subcontractors who were subsequently paid for returning to the project pursuant to later

agreements with replacement contractor Bovis.

## **CONCLUSION**

As set forth above, the Court rules in favor of HRH and grants Curtis's trust fund claims

in connection with requisitions 14 through 16.  All other causes of action are denied.  The parties

should submit an agreed upon order and judgment consistent with this decision.[22]

**August 2, 2011**
New York, New York                                    */s/ Sean H. Lane*
                                                                THE HONORABLE SEAN H. LANE
                                                                UNITED STATES BANKRUPTCY JUDGE

---

[21] NYU should also release its retainer to Curtis.

[22] Neither NYU nor HRH discussed the calculation of interest at trial or in briefing.  Curtis proposed an interest rate
    of 9% pursuant to New York CPLR § 5004, but the Court will not address this issue unless the parties are unable
    to agree upon an interest calculation in the proposed order and judgment to be submitted.